**STATE**

v.

**Walter A. PERRY, Jr.**

**No. 85–276–C.A.**

Supreme Court of Rhode Island.

May 14, 1986.

Arlene Violet, Atty. Gen., Jeffrey B. Pine, Asst. Atty. Gen., for plaintiff.

William C. Clifton, Stone & Clifton, Lauren E. Jones, Jones & Aisenberg, on brief, Providence, for defendant.

## OPINION

WEISBERGER, Justice.

This case comes before us on the state's appeal from an order of the Superior Court suppressing oral and videotaped statements made by the defendant to members of the South Kingstown police department relating to the beating death of a nineteen-month-old baby girl. The state also appeals from a ruling by the Superior Court denying the state's motion for a competency examination of the defendant. We vacate both rulings and remand with directions. The facts of the case insofar as pertinent to this appeal are as follows.

On April 9, 1984, Leah Perry (the child) was brought to South County Hospital by her mother, Tina Perry (Tina). The two were accompanied by Tina's live-in boyfriend, Walter A. Perry, Jr. (defendant). The child was later transferred to Rhode Island Hospital where efforts to save her life were unavailing. The autopsy report indicated that the child had died "as a result of child abuse syndrome manifested by multiple scars, burns, healing subgaleal contusions, laceration of the lips and a ruptured jejunum,[1] due to blunt force trauma." Two members of the South Kingstown police department came to South County Hospital and talked to Tina about the nature and history of the child's injuries. Thereafter, a warrant for the arrest of Walter Perry for the crime of assault was issued,[2] and defendant was arrested in Providence by members of the Rhode Island State Police and Providence police. During that afternoon defendant (a cousin of the child's natural father, who had previously been married to Tina) was turned over to Sergeant William Robertson and Detective Daniel Watson of the South Kingstown po-

---

1. The jejunum is "[t]hat portion of the small intestine which extends from the duodenum to the ileum." Dorland's Illustrated Medical Dictionary 768 (24th ed. 1965).

2. At the time the warrant was issued, the child was not dead.

lice department. Sergeant Robertson advised defendant of his *Miranda* rights and placed him in the back seat of an automobile for transportation to the South Kingstown police headquarters. The defendant was handcuffed.

During the ride to the station defendant made a number of inculpatory statements concerning his slapping and striking the child. After arrival at the station, defendant was again advised of his right to remain silent and his right to counsel. He signed a so-called *Miranda* rights form and repeated during the course of a videotaped interrogation his admissions concerning the striking and other abusive treatment of the child. It was not until after the videotaped interrogation had been completed that the police were informed by representatives of Rhode Island Hospital that the child had died.

The thrust of defendant's motion to suppress his oral and video-taped statements was that defendant was retarded to such a degree that he was unable to understand his *Miranda* rights, which were concededly given to him upon his arrest and later at the South Kingstown police station. The trial justice found that the state had not sustained the burden of proving by clear and convincing evidence that defendant's ability to understand his *Miranda* rights was sufficient in order to establish that he had voluntarily and intentionally abandoned a known right. This standard was enunciated in *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). In passing upon the correctness of this ruling, it will be instructive to set forth the video-taped colloquy in which defendant was admonished of these rights.

"SGT. ROBERTSON: * * * I talked with you at the Providence police earlier today when we arrested you. Also in the office is Detective Danny Watson. He's the man over there behind the camera. Walter, what we are going to do is I am going to advise you of your rights in reference to a crime, okay?

"THE DEFENDANT: Uh hum.

"SGT. ROBERTSON: But, before I do that I want to make sure you're aware this is a video camera that's running up here.

"THE DEFENDANT: Right.

"SGT. ROBERTSON: And, do you have any objection to us tape recording this on a video camera?

"THE DEFENDANT: If that's what you got to do.

"SGT. ROBERTSON: Well, the reason we want to is you told me you don't know how to read, is that correct?

"THE DEFENDANT: Right.

"SGT. ROBERTSON: You can't read very well or hardly at all.

"THE DEFENDANT: I can read somewhat, but not that good, you know.

"SGT. ROBERTSON: We'll do it this way and the courts will know what's taking place here in my office, all right?

"THE DEFENDANT: Right.

"SGT. ROBERTSON: According to my watch, the watch on the wall right there it's 5:35.

"THE DEFENDANT: Right.

"SGT. ROBERTSON: Would you say that's correct?

"THE DEFENDANT: Right.

"SGT. ROBERTSON: And the date is April 9, 1974, [*sic*] are you aware of that?

"THE DEFENDANT: Yes.

"SGT. ROBERTSON: Okay, Walter, this is a rights form, okay?

"THE DEFENDANT: Right.

"SGT. ROBERTSON: We have the time which I am going to put on here now is 5:35, okay?

"THE DEFENDANT: Right.

"SGT. ROBERTSON: 5:35 p.m.

"THE DEFENDANT: Uh hum.

"SGT. ROBERTSON: The date is 4/9/84.

"THE DEFENDANT: Right.

"SGT. ROBERTSON: And the day is Monday, are you aware of that?

"THE DEFENDANT: Right.

"SGT. ROBERTSON: I am writing that in, okay? In office of —— here I'll put Sergeant Robertson.

"THE DEFENDANT: Uh hum.

"SGT. ROBERTSON: All right, Walter what this is 'I' and your name would go here.

"THE DEFENDANT: Right.

"SGT. ROBERTSON: You are being informed you are a suspect in the crime of, right now, of assault, okay?

"THE DEFENDANT: Right.

"SGT. ROBERTSON: And this could change if something were to happen to Leah Perry, all right?

"THE DEFENDANT: Uh hum. What do you mean?

"SGT. ROBERTSON: Well, if she were to die or something like that you could have a more serious charge brought against you.

"THE DEFENDANT: I can go to jail for life you mean?

"SGT. ROBERTSON: Well, I don't know because I don't know what charge we are talking about yet. You could be charged with manslaughter; you could be charged with murder. I am not sure of that.

"THE DEFENDANT: How many years could I probably get out of that?

"SGT. ROBERTSON: We are not saying you're guilty, yet. That's not for us to decide guilt. You're being informed you're a suspect in the crime right now of assault, but it could be a more serious crime.

"THE DEFENDANT: Right.

"SGT. ROBERTSON: And that you are voluntarily, without threats or promises on the part of the police, that's Detective Watson and myself——

"THE DEFENDANT: Right.

"SGT. ROBERTSON: You make the following statement to members of the South Kingstown police department.

"THE DEFENDANT: Right.

"SGT. ROBERTSON: After having been advised number one, I do not have to give a statement, okay?

"THE DEFENDANT: Right.

"SGT. ROBERTSON: You understand that?

"THE DEFENDANT: Right

"SGT. ROBERTSON: Okay, number two, I have the right to remain silent?

"THE DEFENDANT: Yes, that is what you told me up there.

"(Inaudible)

"SGT. ROBERTSON: You don't have to talk.

"THE DEFENDANT: Right.

"SGT. ROBERTSON: Anything you say can and will be used against you in a court of law.

"THE DEFENDANT: Right.

"SGT. ROBERTSON: Do you understand that?

"THE DEFENDANT: Right, yes, that is all in telling the truth though, as I told you I was going to do.

"(Inaudible) "SGT. ROBERTSON: I have the right to the presence of an attorney or lawyer, okay, prior to and during any questioning by the police, okay? If you want a lawyer we will stop right now and call your lawyer whatever you want, just the same way I explained it to you up there.

"THE DEFENDANT: Right.

"SGT. ROBERTSON: You understand?

"THE DEFENDANT: Right. You think I need one?

"SGT. ROBERTSON: Well, that is up to you to decide. I can't make that decision for you.

"THE DEFENDANT: What do you mean? Now I probably have to have a lawyer?

"SGT. ROBERTSON: Well, I don't know if you feel you need a lawyer now or not.

"THE DEFENDANT: Not really. I just hope everything works out all right. In that case, I don't need no lawyer, you know. (Inaudible)

"SGT. ROBERTSON: Sooner or later the court will appoint a lawyer for you, all right. If you don't want one right now, if you don't want a lawyer right now the court will appoint a lawyer for you. You know if you're not working. Are you working now?

"THE DEFENDANT: No, I am not, sir.

"SGT. ROBERTSON: So if you're not working right now you make that known to the court and they will appoint a public defender okay, if you want a lawyer right now, okay, that is a different story. We will be glad to make arrangements for you to get a lawyer now. That is four. Five, you have the right to the presence of an attorney during a line-up or confrontation of witnesses. We are not going to have a line-up.

"THE DEFENDANT: Right.

"SGT. ROBERTSON: So that doesn't apply right now.

"THE DEFENDANT: All right.

"SGT. ROBERTSON: If you cannot afford an attorney or lawyer one will be appointed for you prior to any questioning if you so desire. That is what I explained to you up here —

"THE DEFENDANT: Right. (Inaudible) — from number four.

"SGT. ROBERTSON: From number four. Okay?

"THE DEFENDANT: Uh-huh.

"SGT. ROBERTSON: After I having been informed of my constitutional rights — you do understand these rights, right, do you understand what I have told you?

"THE DEFENDANT: Yes sir.

"SGT. ROBERTSON: And you agree to give a statement at this time.

"THE DEFENDANT: Yes."

In his decision the trial justice determined on the basis of expert testimony given by Vicki Moss, doctor of clinical psychology, relying on tests of defendant, that he was unable to comprehend the admonitions given to him by the members of the South Kingstown police department. Doctor Moss had not viewed the tape but based her opinion upon her testing of defendant.

In answer to a question on cross-examination the following exchange took place between state's counsel and Dr. Moss:

"[Q.] And you are saying that even at a most primitive level of explanation that this defendant would not have understood the words and thrust of *Miranda* warnings, is that your testimony?

"[A.] It would. He would not understand the meaning, correct, and many of the words, I am sure."

In determining that defendant was unable to understand the *Miranda* rights, the trial justice relied upon Dr. Moss's opinion and rejected the contrary opinion of David J. Heaney, master of science in the field of clinical and school psychology, who generally indicated that defendant was able to understand "the essence" of the admonitions concerning *Miranda* rights as set forth in the videotape.

██ The state also cites in support of its appeal a ruling by the trial justice excluding from evidence the school record of defendant relating to courses taken and grades achieved in the special education program at Chariho High School. Apparently the trial justice rejected this evidence as remote and immaterial. He seemed to take the position that the school records of ten or twelve years preceding the date of the interrogation "[stretched] the totality of these circumstances beyond the breaking point." In the case at bar, we are dealing with the ability of defendant to function at a very basic level indeed. In determining defendant's ability to understand such phrases as "you don't have to talk" and "if you want a lawyer, we will stop right now and call your lawyer," a

totality-of-circumstance approach is most essential. *State v. Amado*, 424 A.2d 1057 (R.I.1981). In a totality-of-circumstance evaluation the background, experience, and conduct of the accused are all highly relevant. *North Carolina v. Butler*, 441 U.S. 369, 374-75, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286, 293 (1979). Certainly, in determining background and experience, the educational accomplishments or lack of accomplishments are highly relevant. To suggest that the school record of a defendant is immaterial because that record was acquired a number of years prior to the interrogation is erroneous. People are affected by the learning process to which they have been exposed in elementary and secondary education and beyond for the rest of their lives as well as for a brief period following graduation. We are discussing functional abilities in this case, not merely the acquisition of information. Although testing in order to determine basic intelligence will also be relevant, to hold that it completely supersedes educational experiences obtained over a period of years, as well as evaluation of teachers during that period of years, is, in our opinion, erroneous under the totality-of-circumstances test.

The state also challenges the ruling of the trial justice denying the state's motion for a competency hearing. General Laws 1956 (1984 Reenactment) § 40.1–5.3–3(b) provides as follows: "At any time prior to imposition of sentence, if a court in which a criminal proceeding is pending has reason to suspect that a defendant is incompetent, it shall order an examination of the defendant by one or more qualified physicians."

In our opinion, the finding by the trial justice, based upon the testimony of Dr. Moss, that defendant was unable to comprehend such rudimentary statements as were set forth in the videotaped account of admonitions given by the South Kingstown police would also give rise to a most potent basis for suspecting that defendant was incompetent to stand trial and most particularly to understand the nature of the charges against him, to grasp the object of the trial proceedings, and to function in the required capacity of properly and rationally assisting his counsel in his own defense. *State v. Cook*, 104 R.I. 442, 446–47, 244 A.2d 833, 835–36 (1968). Indeed, the testimony of Dr. Moss concerning defendant's inability to understand the meanings of *Miranda* warnings "even at a most primitive level of explanation" would, if believed by the trial justice, create a suspicion of incompetence almost in and of itself. It is obvious that the trial justice did believe and fully credited the testimony of Dr. Moss. This testimony could not be contradicted by the subjective assertions of defendant's lawyer that he had devised a method of communication with defendant.

■ ■ We are therefore of the opinion that the trial justice committed error in failing to order a competency hearing. Moreover, for the guidance of trial justices in the future, we are of the opinion that a defendant who seeks to suppress statements made to the police on the ground that he was functionally unable to understand the *Miranda* warnings by reason of retardation or mental illness or incapacity should in most instances, be referred for a competency examination prior to the determination of the motion to suppress.

For the reasons stated, the order of the trial justice suppressing the oral and videotaped statements of the defendant and denying the state's motion for a competency examination is hereby vacated. The papers in the case are remanded to the Superior Court with directions to order a competency examination of the defendant in accordance with the provisions of § 40.1–5.3–3(b) and thereafter for further proceedings consistent with this opinion.